UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED

MAY 0 6 2005

CLERK

*************************************************************************

|  |  |  |
|---|---|---|
| ELLISON KALDA, M.D.; ROBERT DAHL, M.D.; MARILYN MCFARLANE, P.A.; DAVID H. HYLLAND, Ed.D.; RICHARD G. WHITTEN, Ph.D.; CYNTHIA L. PILKINGTON, Ph.D.; and MARY K. KUNDE, Ph.D.; individually and for their individual plan accounts and on behalf of The Central Plains Clinic, Ltd. Money Purchase Pension and Profit Sharing Plan, and the Central Plains Clinic, Ltd. 401(k) Plan, | * * * * * * * * * * * | CIV 02-4230 |
| Plaintiffs, | * * | |
| -vs- | * * * | MEMORANDUM OPINION AND ORDER |
| SIOUX VALLEY PHYSICIAN PARTNERS, INC., formerly Central Plains Clinic, Ltd.; SIOUX VALLEY HOSPITAL; T.A. SCHULTZ, M.D.; RICHARD HARDIE, M.D.; GENE BURRISH, M.D.; DAVID DANIELSON; MICHAEL FARRITOR, M.D.; JOHN RITTMANN, M.D.; and STEVEN SALMELA, M.D., | * * * * * * * * * * | |
| Defendants. | * * | |

*************************************************************************

Both Plaintiffs and Defendants have filed a Motion for Summary Judgment, Docs. 42 and 37. The motions have been fully briefed and oral argument was heard on April 25, 2005. For the reasons set forth below, Defendants' motion will be granted and Plaintiffs' motion will be denied.

## BACKGROUND

Plaintiffs are a group of former employees of Central Plains Clinic, Ltd. ("CPC"), which was a medical clinic located in Sioux Falls, South Dakota. Before the relevant time periods in this action, CPC established benefit plans called the Central Plains Clinic, Ltd. Money Purchase Pension Plan ("Pension Plan"), and the Central Plains Clinic Profit Sharing Plan ("Profit Sharing Plan) (collectively referred to as "the Plans"). In 1998, CPC added the Central Plains Clinic, Ltd. 401(k) Plan ("401(k) Plan"). These plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* During the years 1999, 2000 and parts of 2001, all Plaintiffs were participants in the Pension Plan and the Profit Sharing Plan, and all Plaintiffs, except Marilyn McFarlane, were participants in the 401(k) Plan. CPC was the administrator of the Plans and was a fiduciary when acting as administrator of the Plans. The individually named Defendants were officers and directors of CPC.

Before 1999, CPC was in severe financial straits with an unmanageable amount of debt. The largest creditor of CPC was Rabobank and in December 1998 that debt was more than $32 million. Thus, CPC began evaluating options for refinancing or sale of the clinic. To improve its financial picture, CPC decided to cease funding the Pension Plan, effective December 29, 1998. CPC formally amended the Pension Plan to provide for zero funding for the year 1998 and forward. CPC later made a contribution to the Profit Sharing Plan for calendar year 1998 in an amount equal to what would have been contributed to the Pension Plan if CPC had not zero-funded the Pension Plan. To make a contribution to the Pension Plan and receive all of the tax benefits for such a contribution, CPC needed to make that contribution by December 31, 1998. Contributions for the 1998 plan year for the Profit-Sharing Plan, however, could be made as late as September 1999 and still receive the beneficial tax treatment. There were no contributions by CPC to either the Pension Plan or the Profit Sharing Plan for plan years 1999, 2000 or 2001.

Plaintiffs contend that CPC and the individual fiduciaries intended the zero-funding amendment to the Pension Plan to be a *suspension* of the contributions to the Plans to allow CPC to improve its balance sheet and the profit loss statement and the Defendants orally communicated

2

this intent to Plaintiffs. The suspended contributions were treated as indebtedness to the Plans on CPC's financial records. Plaintiffs claim the indebtedness was on CPC's records until April 4, 2001, when CPC merged with a hospital as described below. Defendants, however, assert that at least the amount for the 1999 plan year was removed from CPC's records following a 2000 audit. Plaintiffs assert that CPC, through the Defendants, its authorized officers and directors, represented that if CPC was able to refinance, sell or otherwise resolve its financial problems, that the funding that had been suspended would then be contributed to the Plans. The Defendants did carry through with this representation for plan year 1998 by contributing to the Profit Sharing Plan the amount that would have been contributed to the Pension Plan for 1998 if it had not been amended.

Defendants admit they *hoped* that if CPC became financially stable the amounts carried on the financial records as indebtedness to the Plans might be paid if permissible by law. But at least two Defendants testified that no promises were made to Plan Participants that the Plans would be funded for the past years. (Schultz Depo. at p. 3436, 44, 52; Burrish Depo. at p. 20-21.) They further admit they informed Plaintiffs and others that if CPC's financial condition improved, contributions to the Plans *might be* made in the future.

Plaintiffs continued their employment with CPC after the Pension Plan was zero-funded. Separate discussions to explore options for CPC's future and financial problems were held in the Spring of 2000 between CPC and Avera McKennan Hospital ("Avera McKennan") and between CPC and Sioux Valley Hospitals and Health System and Sioux Valley Physician Partners, Inc. ("Sioux Valley"). In September or October 2000, CPC and Sioux Valley entered into a standstill agreement that precluded CPC and Sioux Valley from negotiating with other parties during the existence of the agreement. CPC's initial goal was to keep CPC an independent entity. As negotiations continued, the standstill agreement between CPC and Sioux Valley was renewed one or two additional times.

During the negotiations, CPC initially sought the funding of the Plans in the amount that was reflected as indebtedness to the Plans. As negotiations continued, however, Sioux Valley offered

3

CPC staff bonuses equal to the suspended plan contributions if they joined Sioux Valley and remained employed for a certain period of time. CPC did not object to using such retention bonuses rather than fully funding the Plans as reflected on CPC's financial records. On or about December 18, 2000, CPC and Sioux Valley executed a letter of intent to merge. The letter of intent provided that CPC physicians and employees of record on January 1, 2000, who remained employed with CPC through the closing of the merger would be paid retention bonuses in amounts equal to their Plan contributions for plan years 1999, 2000 and a prorated amount for 2001. Non-physicians who transferred to Sioux Valley from CPC who stayed for 30 days were paid the agreed upon amount. Physicians and CPC's executive director, Defendant Danielson, were required to stay with Sioux Valley for two years to qualify for the full retention bonus, with one-half being paid after twelve months. The Plaintiffs were not eligible and did not receive the retention bonuses and they have not received the suspended Plan contributions for the years 1999, 2000 and the partial year of 2001.

The letter of intent between CPC and Sioux Valley also provided that efforts would be made to negotiate a $5 million discount on CPC's indebtedness to Rabobank. When Rabobank learned of this intent to seek a discount, it requested that Avera McKennan make a proposal to CPC. Avera McKennan informed CPC that it was interested in making a proposal to CPC by letter dated March 9, 2001. On March 26, 2001, however, the CPC Board of Directors adopted a merger and stock purchase agreement with Sioux Valley. Notice of a meeting to vote on the proposed merger was given to all shareholders and employees. Avera McKennan sent a proposal directly to CPC shareholders and held a meeting for CPC shareholders before the vote on the Sioux Valley merger. The proposal sent by Avera McKennan provided that the entire debt to Rabobank would be paid and under a section captioned "Payments to Physicians," it offered to make pension plan payments not made for the prior two years, but did not offer additional details. Sioux Valley and Rabobank then reached an agreement under which the CPC's Rabobank debt would be paid in full. Thereafter Rabobank supported a merger with Sioux Valley.

The CPC Board of Directors approved and executed the merger agreement on April 5, 2001. After executing the merger agreement, Sioux Valley obtained a comparative analysis of the Sioux

4

Valley and Avera McKennan proposals. After the comparative analysis was received and reviewed, the merger agreement with Sioux Valley was reaffirmed by the CPC Board of Directors on April 12, 2001. The merger agreement was not effective, however, until a majority of the CPC shareholders approved it. Each CPC shareholder held an equal amount of stock and had an equal vote. The merger proposal with Sioux Valley was approved on April 17, 2001, by a vote of 77 shareholders in favor to 31 shareholders against. None of the Plaintiffs participated in this vote, however, because they were no longer employed by CPC in April 2001.

The accrued indebtedness to the Plans of nearly $5 million was erased from the financial records of CPC, either before or at the time the merger agreement was approved. As mentioned above, CPC physicians and non-physicians who joined Sioux Valley were paid these amounts as retention bonuses. But Plaintiffs were not eligible for the Sioux Valley retention incentive payments because they were no longer employed by CPC at the time of the merger and they did not receive any benefits from the Plans for 1999, 2000 and the partial year of 2001.

The claims in this action are for: (1) breach of plan under ERISA, pursuant to 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3)(B)(i) and (ii), 1132(c)(1)(B) and 1132(e)(1); (2) breaches of fiduciary duties under ERISA, pursuant to 29 U.S.C. §§ 1104, 1105, 1106 and 1109; and (3) declaratory judgment under 29 U.S.C. § 2201. Administrative remedies were pursued by Plaintiffs, but Plaintiffs were denied relief in the administrative process. Plaintiffs seek to enforce and fully fund the Plans, with interest, as well as to disgorge Defendants of any financial incentives they may have received from Sioux Valley relating to the sale of CPC to Sioux Valley. The Court previously granted Defendants' Motion to Dismiss to the extent that the First Amended Complaint stated a claim for breach of fiduciary duty for the act of modifying the Pension Plan to discontinue contributions to the Pension Plan. (Memorandum Opinion and Order, Doc. 20, July 23, 2003.)

## DISCUSSION

Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

5

Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). In reviewing a motion for summary judgment, this Court views the evidence in a light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992) (quoting Fed.R.Civ.P. 56(e)).

There are two categories of claims in this case. The first is for breach of fiduciary duty for failure to pay the 1999, 2000 and 2001 benefits that CPC carried on its books as the amounts that would have been paid into the Plans if CPC had not adopted the zero-funding amendment. The second category of claims relate to various misrepresentations Plaintiffs allege Defendants made regarding benefits under the Plans.

I.     Failure to Pay 1999, 2000 and 2001 Benefits

In the negotiations with Sioux Valley, CPC attempted to negotiate funding of all benefits that had been accrued on CPC's books, but had not been paid. Sioux Valley, however, would not agree to pay those past benefits and instead offered to pay retention bonuses to those physicians and non-physicians who remained at CPC and continued their employment with Sioux Valley after the merger. The amount of the retention bonuses was equal to the amount of the benefits accrued on CPC's books for each individual continuing their employment with Sioux Valley, but certain restrictions were imposed on the payment of the retention bonuses concerning the length of time the individuals continued to work for Sioux Valley after the merger. None of the Plaintiffs were eligible for these retention bonuses because they had either voluntarily left CPC's employment, or, in the case of the behavioral health department, had been terminated by CPC, before the merger.

Although Defendants admit they were fiduciaries with respect to the Plans, Defendants contend that they were not acting as ERISA fiduciaries in the merger with Sioux Valley and that they did not breach their fiduciary duties under ERISA by merging with Sioux Valley instead of Avera

6

McKennan. Plaintiffs do not contend, however, that the merger with Sioux Valley itself was a breach of fiduciary duty. Rather, Plaintiffs allege that instead of protecting the debt owed to the Plans during the negotiations with Sioux Valley, it was a breach of fiduciary duty for the Defendants to use that debt (i.e., Plan assets according to Plaintiffs), "as a bargaining chip to further their own personal interests to the detriment of the Plans and numerous Plan Participants[.]" (Plaintiffs' Brief in Support of Summary Judgment, Doc. 43 at p.10.) The claim is that Defendants bargained away Plaintiffs' shares of the accrued debt owed to the Plans in return for Sioux Valley allowing Defendants to share in the governance of CPC after it was merged with Sioux Valley. While Defendants were bargaining away Plaintiffs' shares of the accrued debt, Defendants allegedly protected their own personal shares of the accrued debt owed to the Plans as a result of the retention bonuses offered by Sioux Valley and accepted by CPC. An additional alleged breach resulted from Defendants' failure to disclose incentive structures related to the merger with Sioux Valley, because financial incentives are relevant to determining the fiduciary's motive.

Defendants argue that they were not acting in a fiduciary capacity when they took the actions of which Plaintiffs complain. It is clear that employers may act in a dual capacity and do not always act as plan fiduciaries:

> The ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets.

*Anderson v. Resolution Trust Corp.*, 66 F.3d 956, 960 (8th Cir. 1995) (internal quotation marks and citations omitted). The Supreme Court explained that the Court must examine whether a plan fiduciary was acting in a fiduciary capacity to determine liability for breach of fiduciary duty:

> In every case charging breach of fiduciary duty ... the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Before the issue of whether any of the Defendants were acting in a fiduciary capacity versus employer is reached, however, the Court must first

7

determine whether the benefits that were recorded on CPC's records as a debt to the Plans constitute "plan assets" under ERISA.

ERISA provides that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). "'This definition requires (1) showing that the plan assets are at issue and (2) that the individual defendants exercised authority or control relating to the management or disposition of such assets.'" *NYSA-ILA Med. & Clinical Serv. Fund v. Catucci*, 60 F.Supp.2d 194, 200 (S.D.N.Y. 1999) (citations omitted).

Defendants cite two cases for the proposition that the debt recorded on CPC's financial records was not a "plan asset" under ERISA. *See Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000); *DeFelice v. Daspin*, 2002 WL 1373759, *6 (E.D.Pa. Jun. 25, 2002). Those cases involved employers who failed to make contributions to ERISA plans as required by the plans. The unpaid contributions to the ERISA plans were not found to be "plan assets." *Id.* The Ninth Circuit held that "[u]ntil the employer pays the employer contributions over to the plan, the contributions do not become plan assets over which fiduciaries of the plan have a fiduciary obligation; this is true even where the employer is also a fiduciary of the plan." *Cline*, 200 F.3d at 1234. The Eleventh Circuit adopted a similar rule in holding that, "until monies were paid by the corporation to the plan there were no assets in the plan under the provisions of ERISA." *Local Union 2134, United Mine Workers of America v. Powhatan Fuel, Inc.*, 828 F.2d 710, 714 (11th Cir. 1987). This bright-line rule has not been adopted, however, by the majority of the courts that have examined the issue of whether unpaid employer contributions are plan assets.

The Court located a line of cases where the courts evaluated the specific language of the documents requiring the contributions to be made to determine whether unpaid employer

contributions were "vested" in the ERISA plans, despite the failure to pay the monies to the plans.[1] In some of those cases, the language of the ERISA plan stated that amounts that were "due and owing" or "accrued to" to the plan were "vested" in the fund, and, thus, were "plan assets." *Laborers Combined Funds of Western Pa. v. Cioppa*, 346 F.Supp.2d 765, 771 (W.D.Pa. 2004); *NYSA-ILA Med.*, 60 F.Supp.2d at 200-01; *Galgay v. Gangloff*, 677 F.Supp. 295, 301-02 (M.D.Pa. 1987).

There is no language in any of the document in the record in this case that is similar to the language in the cases holding that unpaid employer contributions are plan assets. The unpaid contributions to the Plans in this case were recorded as a debt on CPC's financial records. In addition to there being an absence of vesting language related to these unpaid contributions, the debt was contingent upon CPC's financial condition improving. Plaintiffs have not cited, and the Court has not located, any authority for the proposition that contingent unpaid employer contributions to an ERISA plan are "plan assets" in the absence of some type of vesting language regarding such unpaid contributions. Based upon the above discussion, the Court concludes that the unpaid

---

[1]*Laborers Combined Funds of Western Pa. v. Cioppa*, 346 F.Supp.2d 765, 770-71 (W.D.Pa. 2004) (holding employer's unpaid contributions were plan assets based upon the agreement creating the ERISA fund stating that, "[t]itle to all of the money ... accrued to the fund shall be vested in and remain exclusively in the board of trustees of the fund...."); *NYSA-ILA Med. & Clinical Serv. Fund v. Catucci*, 60 F.Supp.2d 194, 200-01 (S.D.N.Y. 1999) (finding that alleged unpaid employer contributions were vested plan assets where the plan defined its assets as "money received from or owing from any other ... corporation ... required to make payments to this Fund."); *United States v. Panepinto*, 818 F.Supp. 48, 50-51 (E.D.N.Y. 1993) (holding that under the wage agreements, the employer had no legal interest in unpaid employer contributions to an ERISA fund, and, thus, those unpaid contributions were "plan assets" so that defendants accused of participating in scheme to divert employer contributions could be charged with embezzling and conspiring to embezzle fund assets); *PMTA-ILA Containerization Fund v. Rose*, 1995 WL 461269, *4 (E.D.Pa. Aug. 2, 1995) (finding unpaid contributions to an ERISA fund were plan assets based upon the same language as the agreement in *Cioppa*, 346 F.Supp.2d at 770-71.); *Young v. West Coast Indus. Relations Ass'n, Inc.*, 763 F.Supp.64, 75-76 (D.Del.1991) (holding that "delinquent [employer] contributions are to be treated as a debt owed to the benefit fund and not as a vested asset," based upon the language in the collective bargaining agreement);*Galgay v. Gangloff*, 677 F.Supp. 295, 301-02 (M.D.Pa. 1987) (holding that the language of the wage agreement, "stating that title to all monies 'due and owing' the plaintiff fund is 'vested' in the fund, made any delinquent employer contributions "plan assets").

contributions to the Plans, which were accrued on CPC's financial records, were not "plan assets." Thus, Defendants cannot be held liable for breach of fiduciary duty relating to the management or disposition of any plan assets.

Plaintiffs contend that even if the accrued unpaid contributions were not "plan assets," Defendants were nevertheless acting in a fiduciary capacity when the debt was erased from CPC's financial records. Defendants counter that they were acting in the capacity of employer, rather than fiduciary, when they negotiated the merger with Sioux Valley. Although the merger agreement resulted in the Plans not being funded, Defendants contend that given the contingent and non-vested nature of the accrued debt to the Plans, Defendants were not prohibited from reaching an agreement that had a detrimental effect on the Plans.

In support of the argument that they were acting as an employer, rather than a fiduciary, Defendants cite an Eleventh Circuit Court of Appeals' decision that rejected a group of employees' breach of ERISA fiduciary duty claim where their employer, Amoco Oil Co., sold its business and the acquiring company did not provide the employees credit for the time they had worked for Amoco in the acquiring company's retirement plan. *See Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir. 1986). The employees alleged that Amoco breached its fiduciary duty under ERISA by negotiating a higher sale price by giving up the employees' credit for their years of service with Amoco. *See id.* The *Phillips* court affirmed the district court, which had held that, "the fiduciary provisions of ERISA are not implicated in the sale of a business merely because the terms of the sale will affect contingent and non-vested future retirement benefits." *Id.* The appellate court recognized that the district court's holding was supported by three concepts: (1) "... ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued;" (2) "... the ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer;" and (3) "ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets." *Id.*

10

Considering contingent benefits, the Fourth Circuit held that an employer did not violate ERISA, either in its capacity as employer or as ERISA fiduciary, by renegotiating provisions of a collective bargaining agreement involving unfunded, contingent early retirement benefits and severance payments. *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 724 F.2d 406, 411-12 (4th Cir. 1983). Despite Plaintiffs allegations to the contrary, there is no genuine issue of material fact that the accrued benefits were non-vested and contingent. Although Defendants allegedly promised Plaintiffs that the accrued benefits would be paid to them if they stayed employed by CPC while it was in the process of refinancing or attempting to become profitable, there is nothing in the record to establish that these accrued benefits were vested or non-contingent. For the purposes of this motion, the Court must consider that such a promise was made. The Court finds that in negotiating and entering into the merger agreement with Sioux Valley, the Defendants were not administering the plan or investing its assets. Rather, they were acting in accordance with their interests as employer and ERISA did not prohibit them from eliminating the contingent, non-vested debt to the Plans. This case does illustrate that even though ERISA allows management to be a plan fiduciary, it is an area where potential conflicts of interest require caution. *See Deak v. Masters, Mates and Pilots Pension Plan*, 821 F.2d 572, 580-81 (11th Cir. 1987).

II.   Misrepresentation

ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). In performing these duties, the fiduciary may not "'materially mislead those to whom the duties of loyalty and prudence are owed.'" *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 491-92 (3d Cir. 2000) (quoting *In re Unisys Corp. Retiree Med. Benefits "ERISA" Litig.*, 57 F.3d 1255, 1261 (3d Cir. 1995)). The Eighth Circuit recognized that "'misleading communications to plan participants regarding plan administration ... will support a claim for breach of fiduciary duty.'" *Howe v. Varity Corp.*, 36 F.3d 746, 753-54 (8th Cir. 1994) (quoting *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988)). "'Misrepresentations and omissions are breaches of ... fiduciary obligations. Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of

ERISA, 29 U.S.C. § 1104(a)(1).'" *Id.* (quoting *Peoria Union Stockyards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983)).

The Third Circuit held that a plan administrator acts in a fiduciary capacity "when explaining plan benefits and business decisions about plan benefits to its employees." *Adams*, 204 F.3d at 492. Moreover, the Supreme Court recognized that, "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose. After all, ERISA itself specifically requires administrators to give beneficiaries certain information about the plan." *Varity Corp v. Howe.*, 516 U.S. 489, 502 (1996). The *Adams* court further held that, "[a]n employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as a fiduciary, made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits, and the beneficiary acted thereupon to his or her detriment." 204 F.2d at 492. Examining alleged fiduciary misrepresentations, the Fifth Circuit held that the provision of information about likely future plan benefits is a fiduciary act, but if the information was truthful when given, it will not support a cause of action for breach of fiduciary duty. *See McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 511 (5th Cir. 2000).

The Court finds there is a dispute regarding what Plaintiffs were told regarding the likely future of their benefits, but it is not a material dispute that precludes Defendants from being entitled to summary judgment. Taking the version most favorable to Plaintiffs, CPC promised Plaintiffs that if CPC were able to refinance or operate profitably, the amounts that would have been contributed to their Pension Plan had it not been zero-funded would be contributed upon refinancing or operating profitably. There is no evidence in the record, however, that this information was not truthful when given to Plaintiffs. *See id.* Despite CPC's efforts to refinance or operate profitably, CPC's financial condition continued to deteriorate in 1999, 2000 and 2001, to the point where the only viable options were bankruptcy or a merger. There is no evidence in the record that *after* CPC had reached a merger agreement with Sioux Valley, which did not include contributions to Plaintiffs' Pension Plan accounts, any Defendant represented to Plaintiffs the contributions *would be* made. Rather, the

12

Plaintiffs were no longer employees or shareholders on April 17, 2001 when CPC shareholders approved the merger agreement with Sioux Valley. The CPC Board of Directors approved the merger agreement on March 26, 2001. Plaintiff Ellison Kalda submitted a letter of resignation on March 12, 2001 and left CPC's employment on April 1, 2001. The behavioral health department was terminated by CPC before the merger agreement was reached with Sioux Valley. Thus, Plaintiffs David Hylland, Richard Whitten, Cynthia Pilkington and Mary Kunde were no longer employed by CPC when the merger with Sioux Valley was entered into or became final. Plaintiffs Marilyn McFarlane and Robert Dahl retired from CPC effective December 31, 2000. There being no evidence of representations being made after the Defendants reached a merger agreement with Sioux Valley, Defendants cannot be held liable under ERISA for breach of fiduciary duty for making misrepresentations regarding Plaintiffs' benefits.

## CONCLUSION

Based upon the discussion above, the Court finds that Defendants are entitled to summary judgment on all of Plaintiffs' claims. Despite the accrual on CPC's financial records of the amounts that would have been paid to the Plans, that debt was not a "plan asset" imposing fiduciary duties on Defendants to assure the payment of such unpaid contributions to the Plans. The Plans could have specified that the debt accrued on the books was a plan asset, but it did not. If the debt had been a plan asset, then fiduciary duties would have applied to require that the unpaid contributions be met from the transaction. Given that the debt was not a "plan asset," Defendants were not prohibited in acting in accordance with their interests as employer in negotiating and entering into the merger agreement with Sioux Valley, which had a negative effect on the contingent, non-vested plan benefits accrued on CPC's financial records. Finally, there is no genuine issue of material fact based upon the record in this case that any of the Defendants made representations regarding Plaintiffs' benefits that were false when made. Accordingly,

IT IS ORDERED:

1.    That Defendants' Motion for Summary Judgment, Doc. 37, is granted.

2.    That Plaintiffs' Motion for Summary Judgment, Doc. 42, is denied.

Dated this _____ day of May, 2005.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
                DEPUTY

14